## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

ROBERT F. DINERO a/k/a ROBBY DINERO,

      Plaintiff,

      -against-

ORCHARD PARK CENTRAL SCHOOL DISTRICT, BOARD
OF EDUCATION OF ORCHARD PARK CENTRAL SCHOOL
DISTRICT, DAVID LILLECK, personally and in his official
capacity as Superintendent of ORCHARD PARK CENTRAL
SCHOOL DISTRICT, BRANDON HAFNER, personally and in
his official capacity as Principal of ORCHARD PARK HIGH
SCHOOL, DIANA NIGRO, personally and in her official
capacity as Principal of ELLICOTT ELEMENTARY SCHOOL,
TOWN OF ORCHARD PARK POLICE DEPARTMENT,
PATRICK M. FITZGERALD, personally and in his official
capacity as Chief of TOWN OF ORCHARD PARK POLICE
DEPARTMENT, JOSEPH WEHRFRITZ, personally and in his
official capacity as Former Chief of TOWN OF ORCHARD
PARK POLICE DEPARTMENT, DARRYL PURUCKER,
personally and in his official capacity as a Detective of TOWN
OF ORCHARD PARK POLICE DEPARTMENT, DAVID
BOWERSOX, personally and in his official capacity as a Police
Officer of TOWN OF ORCHARD PARK POLICE
DEPARTMENT, BRIAN GEHRING, personally and in his
official capacity as a Lieutenant of TOWN OF ORCHARD
PARK POLICE DEPARTMENT, KRISTEN MAZUR,
personally and in her official capacity as a Police Officer of
TOWN OF ORCHARD PARK POLICE DEPARTMENT,
JOEL RAISOR, personally and in his official capacity as a Police
Officer of TOWN OF ORCHARD PARK POLICE
DEPARTMENT, and PATRICK RIZZO, personally and in his
official capacity as a Former Lieutenant of the TOWN OF
ORCHARD PARK POLICE DEPARTMENT,

      Defendants.

-------------------------------------------------------------------------X

**Case No.:** 1:24-cv-213

**COMPLAINT Jury Trial**

**Demanded**

      Plaintiff, Robert F. Dinero a/k/a Robby Dinero ("Dinero" or "Plaintiff"), by and through

his undersigned attorneys, brings this action against Defendants Orchard Park Central School

District ("OPCSD"), Board of Education of Orchard Park Central School District (the "Board"), David Lilleck, personally and in his official capacity as Superintendent of OPCSD ("Lilleck"), Brandon Hafner, personally and in his official capacity as Principal of Orchard Park High School ("Hafner"), Diana Nigro, personally and in her official capacity as Principal of Ellicott Elementary School ("Nigro"), Town of Orchard Park Police Department ("TOPPD"), Patrick M. Fitzgerald, personally and in his official capacity as Chief of TOPPD ("Fitzgerald"), Joseph Wehrfritz, personally and in his official capacity as former Chief of TOPPD ("Wehrfritz"), Darryl Purucker, personally and in his official capacity as a Detective of TOPPD ("Purucker"), David Bowersox, personally and in his official capacity as a Lieutenant of TOPPD ("Bowersox"), Brian Gehring, personally and in his official capacity as a Lieutenant of TOPPD ("Gehring"), Kristen Mazur, personally and in her official capacity as a Police Officer of TOPPD ("Mazur"), Joel Raisor, personally and in his official capacity as a Police Officer of TOPPD ("Raisor"), and Patrick Rizzo, personally and in his official capacity as a Police Officer of TOPPD ("Rizzo") (OPCSD, the Board, Lilleck, Hafner, and Nigro together the "OPCSD Parties"; TOPPD, Fitzgerald, Wehrfritz, Purucker, Gehring, Mazur, Raisor, and Rizzo together the "TOPPD Parties"; the OPCSD Parties and TOPPD Parties together the "Defendants"), and alleges as follows:

## <u>INTRODUCTION</u>

1.  This action arises from the unconstitutional, unlawful, and tortious conduct undertaken by Defendants against Dinero and his children ***<u>in retaliation</u>*** for his constitutionally protected speech and petition for redress of grievances, and in order to harass, harm, intimidate, and silence Dinero.

2.  Dinero's constitutionally protected speech and petition for redress of grievances included (a) Dinero's successful lawsuit (and the viewpoints expressed in that lawsuit) against

OPCSD and the Board in Erie County Supreme Court pursuant to Article 78 of the New York State Civil Practice Law and Rules (the "Article 78 Proceeding" or "Dinero's Article 78 Proceeding"), by which Dinero forced the recalcitrant OPCSD Parties to re-open OPCSD Schools in May 2021 and provide full-time, in-person learning (the "Reopening") after the OPCSD Parties had cancelled in-person learning and then shifted to a full-time "hybrid/remote" learning model during the COVID-19 Pandemic (the "Pandemic"); (b) Dinero's consistent, insightful, and sharp criticism of the arbitrary COVID-19-related policies, protocols, and rules imposed upon citizens by the OPCSD Parties, and local, state, and federal authorities—particularly but not limited to mask mandates and hybrid/remote learning—at Board meetings and in other public fora, both before and after the Reopening (collectively, "Dinero's Criticisms"); (c) Dinero's publicly-stated viewpoints about the Pandemic and the arbitrary COVID-19-related policies, protocols, and rules imposed upon citizens by the OPCSD Parties, and local, state, and federal authorities – viewpoints which were at direct odds with the OPCSD Parties' publicly-stated positions on those subjects; and (d) Dinero's status as a highly vocal leader of parental resistance to the arbitrary COVID-19-related policies, protocols, and rules imposed upon citizens by the OPCSD Parties, and local, state, and federal authorities–many of which, as Dinero pointed out during the Pandemic and its immediate aftermath, turned out to have no scientific basis whatsoever (such as the Centers for Disease Control and Prevention's ("CDC") so-called "Six Foot Social Distancing Rule").[1]

---

1 *See, e.g.,* Graison Danger, "CDC's Six-Foot Social Distancing Rule Was 'Arbitrary,' Says Former FDA Commissioner," *Forbes* (Sept. 19, 2021, updated Dec. 10, 2021), https://www.forbes.com/sites/graisondangor/2021/09/19/cdcs-six-foot-social-distancing-rule-was-arbitrary-says-former-fda-commissioner/?sh=2fafe0c9e8e6; *see also* Christian Britschgi, "Fauci to Congress: 6-Foot Social Distancing Guidance Likely Not Based on Data," *Reason*, (Jan. 10, 2024), https://reason.com/2024/01/10/fauci-to-congress-6-foot-social-distancing-guidance-likely-not-based-on-data/; Polly van den Berg,, "Effectiveness of three versus six feet of physical distancing for controlling spread of COVID-19 among primary and secondary students and staff: a retrospective, state-wide cohort study," Oxford University Press for the

3.      In addition, Dinero's two eldest children (daughter O.C.D. and son V.M.D.) also engaged in constitutionally protected speech when, on January 25, 2022, they attended Orchard Park High School without wearing masks after the Nassau County Supreme Court had ruled the day before that the statewide mask mandate was unconstitutional, illegal, null, void and unenforceable, and were then detained, harassed, and intimidated by Hafner, removed from School grounds by TOPPD at Hafner and Lilleck's direction, and threatened with suspension. As well, also on January 25, 2022, two of Dinero's younger sons, R.B.D. and R.E.D., attended Ellicott Elementary School without wearing a mask after the Nassau County Supreme Court ruling invalidating the mask mandate, only to be bullied and intimidated by Nigro into wearing a mask, and disciplined, all without R.B.D's, R.E.D.'s, or Dinero's consent, contrary to Dinero's express written instructions. Dinero then engaged in additional protected speech when he filed four Petitions with the New York State Education Department ("NYSED") to have all four of the childrens' discipline voided, Hafner removed from his position as Principal, Nigro removed from her position as principal, and Lilleck removed from his position as Superintendent. These Petitions ultimately forced OPCSD to retreat from its discipline against O.C.D., V.M.D., R.B.D., and R.E.D., and turn to other means of harassing Dinero and his family.

4.      Defendants' retaliatory conduct, motivated by Dinero's constitutionally protected speech and petition for redress of grievances, and by a desire to harass, harm, intimidate, and silence Dinero, included (a) the OPCSD Parties—through Lilleck's close relationship with

---

Infectious Diseases Society of America (2021) ("There is no significant difference in K-12 student and staff SARS-CoV-2 case rates in Massachusetts public school districts that implemented >3 feet versus >6 feet of physical distancing between students ................"), https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=ceWGlkz/TUrTzA_PLUS_s4A

Fitzgerald, and by other means—enlisting the TOPPD Parties to initiate criminal prosecutions of Dinero by effectuating false arrests of Dinero on *four separate occasions* resulting in three *criminal charges* and one non-criminal trespass charge (violation) under the New York State Penal Law (the "Penal Law"), for fabricated incidents of "trespass" on OPCSD Property and for a fabricated "violation" of an order of protection obtained in bad faith by the OPCSD Parties, all *without probable cause* (these false arrests together the "False Arrests"); (b) the TOPPD Parties, as directed by the OPCSD parties, actually carrying out the False Arrests; (c) the OPCSD Parties, in cooperation with the TOPPD Parties, imposing constantly-changing and contradictory rules governing Dinero's access to OPCSD (i.e., public) Property, in order to set up the False Arrests; (d) Defendants, subsequent to the False Arrests, aggressively and relentlessly pursuing criminal prosecutions of Dinero (collectively, the "Criminal Prosecutions," each individually a "Criminal Prosecution") with the goal of securing his conviction and incarceration on trespass charges and a criminal contempt charge; (e) Defendants, subsequent to the False Arrests and during the Criminal Prosecutions, seeking the aforesaid baseless orders of protection (the "False Orders of Protection" or the "False Orders") in order to wield the False Orders as swords against Dinero with the goal of instigating further criminal prosecution; (f) Defendants, subsequent to the False Arrests, during the Criminal Prosecutions, and subsequent to issuance of the False Orders, aggressively and relentlessly pursuing further prosecution of Dinero with the goal of securing his conviction and incarceration on a Criminal Contempt charge; (g) the OPCSD Parties delivering multiple intimidating letters to Dinero threatening various legal actions against him for trespass and other fabricated infractions, and tightly controlling Dinero's access to OPCSD Property; (h) arbitrarily prohibiting Dinero from access to OPCSD Property; (i) harassing, intimidating, and attempting to silence Dinero at Board meetings that were open to the public through threats of expulsion and

arrest; (j) prohibiting Dinero from attending Board meetings; (k) selectively enforcing mask rules against Dinero; (l) singling out Dinero for threats of arrest and prosecution; (m) causing Dinero to lose his right to keep and bear arms under the Second Amendment to the Constitution (the Criminal Prosecutions triggered suspension of Dinero's pistol license); (n) the OPCSD Parties' intentional endangerment of Dinero and two of his sons by forcing Dinero to pick up his sons from their OPCSD elementary school at a dangerous location along a busy public road during peak traffic hours; and (o) the OPCSD Parties' progressive harassment of Dinero's children in school, including but not limited to the coordinated actions at two separate schools (Orchard Park High School and Ellicott Elementary School) *on the same day*: (i) removing Dinero's eldest daughter O.C.D. and eldest son V.M.D. from Orchard Park High School against their will, with TOPPD assistance, for not wearing masks, even though the statewide mask mandate was not in effect that day due to a ruling from a Nassau County Supreme Court Justice, and then punishing his daughter for not wearing a mask and for recording a disciplinary meeting with Hafner; and (ii) that same day, forcing R.B.D. and R.E.D. to wear a mask against their will at Ellicott Elementary School, and punishing them for not wearing a mask.

5.    Ultimately, after two bench trials and numerous other court appearances in Village of Orchard Park Justice Court, encompassing the aforementioned three criminal charges and one non-criminal charge (violations) under the Penal Law, Dinero won a resounding victory—acquittal or dismissal on *all three* of the criminal charges (a "not guilty" verdict on one of the criminal charges, a "guilty" verdict only of the lesser included offense of non-criminal trespass on another criminal charge, and dismissal by motion on a third criminal charge), and acquittal on the non-criminal charge (a "not guilty" verdict), proving beyond all doubt that the False Arrests were made without probable cause, also proving that the False Orders of Protection were indeed bogus, and

further proving that the Criminal Prosecutions were a collective sham calculated by Defendants to harass, harm, intimidate, and silence Dinero.

6.      Indeed, over the multiple years that Defendants targeted Dinero and his family for retaliation—2021 to the present—a burning source of frustration that motivated the OPCSD Parties to go to ever-greater lengths to take retaliatory action against Dinero, with the eager assistance of the TOPPD Parties—were Dinero's victories in multiple legal proceedings against or involving the OPCSD Parties. In fact, Dinero's virtually unbroken string of victories, which included the Article 78 Proceeding forcing the Reopening, the successful NYSED Petitions, and earning acquittal or dismissal on the retaliatory criminal charges, continually confounded Lilleck and the rest of OPCSD's leadership as they waged war against Dinero and the First Amendment.

7.      At present, four of Dinero's seven children attend OPCSD schools, each of whom remain at risk of further retaliation by the OPCSD Parties, as does Dinero himself, who must still interact with the OPCSD Parties on a frequent basis.

8.      Defendants, at all times acting under color of state law when they retaliated against Dinero (and his children), violated Dinero's clearly established fundamental rights to freedom of speech and to petition the Government for a redress of grievances under the First Amendment to the United States Constitution. U.S. CONST. amend. I.

9.      In addition, Defendants, at all times acting under color of state law when they instigated (in the case of the OPCSD Parties) and then effectuated (in the case of the TOPPD Parties) the False Arrests, violated Dinero's clearly established fundamental right to be free from unreasonable seizures, particularly arrest without probable cause. The False Arrests were false arrests in violation of the Fourth Amendment to the United States Constitution. U.S. CONST. amend. IV.

10.     Accordingly, Dinero is entitled to compensatory and punitive damages, attorneys' fees, declaratory relief, and injunctive relief, as set forth below.

11.     The need for judicial redress here is particularly acute. While Dinero has tried to restore normalcy and regain his reputation after facing the full force of Orchard Park's local government weaponized against him, this has proven impossible. As President Ronald Reagan's former Secretary of Labor Raymond J. Donovan asked shortly after he was famously acquitted by a Bronx jury on larceny and fraud charges: "Which office do I go to [in order] to get my reputation back?"

## PARTIES & RELEVANT PARTY INFORMATION

### I.    Dinero

12.     Plaintiff, Dinero, is a 52-year-old individual and a citizen of the United States, residing in Orchard Park, New York. Dinero, a devoted husband and father to seven children by birth or marriage (four sons, three daughters), all of whom are intelligent, thoughtful, respectful, and well-liked by their teachers, coaches, and peers, four of whom currently attend OPCSD schools, two of whom attend schools outside of OPCSD, and one of whom formerly attended OPCSD schools.

13.     Dinero's eldest daughter, referred to herein by her initials O.C.D., currently attends college, having graduated from Orchard Park High School (an OPCSD school) in 2022 after beginning at the School in 2018. While attending Orchard Park High School, O.C.D. consistently maintained a grade point average near the top of her class.

14.     Dinero's eldest son, referred to herein by his initials V.M.D., currently attends Orchard Park High School, which he has attended since 2020. V.M.D. is also an outstanding student and athlete.

15.     Dinero's second and third sons—twins—referred to herein by their initials R.B.D. and R.E.D., currently attend Eggert Road Elementary School (an OPCSD school), attended Ellicott Elementary School (an OPCSD school) from 2020-2022, and attended Windom Elementary School (an OPCSD school) from 2022-2023.

16.     Dinero's youngest son, referred to herein by his initials E.R.L., currently attends Eggert Road Elementary School.

17.     In addition to his devotion to family, Dinero is devoted to the United States of America, having bravely and selflessly served in the United States Marine Corps from 1998 to 2012, in combat and numerous other roles. In 1998, Dinero was commissioned as a 2nd Lieutenant, and upon his graduation from The Basic School in 1999, was selected by his over 300 classmates to receive the Gung Ho award, which is given to the 2nd Lieutenant who best exemplifies the spirit and outlook expected of Marines. In 2002-2003, he was deployed for ten months as part of the ground invasion of Iraq as a Maritime Special Purpose Force security platoon commander, during which his platoon participated in a rare hostage rescue operation; this deployment also involved peacekeeping operations in Kosovo, Montenegro, and Albania. By this point already a 1st Lieutenant, he was promoted to Captain. Upon returning from this deployment in Iraq, Dinero was selected to serve as the Unit Operations Officer for the Mountain Warfare Training Center in California, where, from 2003-2006, he was responsible for training over 10,000 Marines. In 2004, Dinero volunteered for deployment in Afghanistan, where he led a small team responsible for training the Afghan Special Forces to work with U.S. Special Forces, and participated in numerous combat and humanitarian missions. He was awarded the Joint Service Achievement Medal for coordinating and executing a body recovery after an international jet crashed atop a mountain, and was also awarded the Defense Meritorious Service Medal for his heroic actions while caught in an

enemy ambush. In 2008, Dinero volunteered to deploy to Iraq yet again, where he served as the Team Deputy for a small team of Marines that was responsible for training the Iraqi Forces. His team participated in continuous combat operations for the majority of what was ultimately a year-long deployment. Dinero was personally responsible for the planning and execution of all patrols and combat missions, and led over 250 combat patrols. For this distinguished service, he was awarded the Bronze Star and promoted to Major.

18.     In addition to his brave and honorable service, Dinero has contributed significantly to his community in multiple ways: donating approximately $50,000 to various charities over the past decade; owning and operating renowned CrossFit gym "Athletes Unleashed" in Orchard Park from August 2012 to October 2023; and at present owning and operating "JDog Junk Removal & Hauling Buffalo South," as part of the larger "JDog" enterprise, which is the largest veteran-owned franchise in the United States.

19.     Dinero also earned a BS in Criminal Justice and a BA in Political Science from Buffalo State College, graduating *summa cum laude*.

## II.     Defendants

20.     Defendant OPCSD is a school district organized and existing under the laws of New York. OPCSD covers a large geographical area of approximately 50 square miles, including portions of six townships in this District (Orchard Park, West Seneca, Hamburg, Boston, Elma, and Aurora), and has four elementary schools, a middle school and a high school, serving some 5,400 students.

21.     Defendant Board is a school board organized and existing under the laws of New York. The Board is elected by OPCSD voters to govern schools and determine educational policies. Board members are local public officials required to follow the United States and New

York Constitutions and serve for three-year terms.

22.     Defendant Lilleck is the Superintendent of OPCSD, and has served in this capacity since July 1, 2021. As Superintendent, Lilleck serves as the executive of the district, oversees the operation of its schools, oversees its educational policies, and is the highest-ranking policymaker with respect to the district's actions and policies on freedom of speech, access to district properties, and communication with parents. Lilleck maintains a longstanding close friendship with Fitzgerald, and also maintains a friendship with Wehrfritz.

23.     Defendant, Hafner, is the Principal of Orchard Park High School, and, at all times relevant to this action, served in this capacity. As Principal, Hafner reports to Lilleck and to the Board, and oversees the operation of the High School and its educational policies.

24.     Defendant Nigro is the Principal of Ellicott Elementary School, and, at all times relevant to this action, served in this capacity. As Principal, Nigro reports to Lilleck and to the Board, and oversee the operation of the Elementary School and its educational policies.

25.     Defendant TOPPD is a police department organized and existing under the laws of New York. TOPPD has jurisdiction over The Town of Orchard Park, which includes OPCSD and Dinero's place of residence.

26.     Defendant Fitzgerald is the Chief of TOPPD, having been promoted to Chief in February 2022 after having briefly served as Acting Chief beginning on January 31, 2022, and having served as a police officer for TOPPD since 2005, including under Wehrfritz. Immediately prior to his ascension to Acting Chief and then Chief, Fitzgerald held the rank of Captain. Fitzgerald maintains a longstanding close friendship with Lilleck.

27.     Defendant Wehrfritz is the former Chief of TOPPD, having served in this capacity from June 2019 to January 31, 2022, and having served as Assistant Chief of Police from February

2013 to June 2019. He began his career with TOPPD as a police officer in 1987. Wehrfritz, like Fitzgerald, maintains a friendship with Lilleck.

28.     Defendant Purucker is a Detective in TOPPD, having been promoted to that position on April 6, 2022 after having served as a police officer in TOPPD.

29.     Defendant Bowersox is a Lieutenant in TOPPD, having been promoted to that position on April 14, 2016 after having served as a police officer with TOPPD.

30.     Defendant Gehring is a Lieutenant in TOPPD, having been promoted to that position on September 2, 2020 after having served as a police officer with TOPPD for thirteen years.

31.     Defendant Mazur is a police officer in TOPPD and served in that capacity at all times relevant to this action.

32.     Defendant Raisor is a police officer in TOPPD and served in that capacity at all times relevant to this action.

33.     Defendant Rizzo is a former Lieutenant in TOPPD, having been promoted to that position on April 14, 2016, and served in that capacity at all times relevant to this action. Rizzo is no longer employed by TOPPD.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

35.      This action, based on violations of Plaintiff's constitutional rights, arises under 42 U.S.C. § 1983 and seeks damages, declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and attorneys' fees and costs under 42 U.S.C. § 1988.

36.     This Court has personal jurisdiction over Defendants since they are situated in or are residents of the Western District of New York.

37.     Venue is proper under 28 U.S.C. § 1391(b)(1), because Defendants are residents of the state of New York and the Western District of New York; or, alternatively, under 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     The COVID-19 Pandemic: Mass Hysteria, and Government Overreach

38.     The Pandemic, also known as the coronavirus pandemic, was a global pandemic of the generally non-fatal but highly contagious coronavirus disease 2019 (COVID-19) caused by respiratory syndrome coronavirus 2 (SARS-CoV-2), which originated in Wuhan, China in late 2019.[2]

39.     The Pandemic quickly mushroomed into an all-consuming medical and financial disaster that impacted health and commerce in virtually every nation, including the United States, in an unprecedented manner—however, much of the disaster resulted not from the COVID-19 virus itself, but rather, from the draconian and tyrannical federal, state, and local governmental *response* to COVID-19.

40.     Indeed, although COVID-19 had extremely low fatality rates in the United States of approximately 0.0932% in 2020 and 0.1156% in 2021, beginning in March 2020, officials at all levels of government hastily imposed unprecedented draconian restrictions on all aspects of society—business, commerce, transportation, travel, public gatherings, and, most pertinent to this action, education. These suffocating restrictions included, most notoriously, mask mandates in

---

2  "COVID-19 pandemic," *Wikipedia*, https://en.wikipedia.org/wiki/COVID-19_pandemic

public locations both indoor and outdoor, lockdowns requiring people to remain in their homes, school closures (with education shifting to full-time remote instruction), and forced closure of so-called "non-essential" businesses.

41.     By the end of March 2020, many once-thriving areas of the United States had transformed into visions of an unrecognizable dystopia. Once-vibrant urban centers of commerce had turned into ghost towns amidst lockdowns. Schools went dark. Restaurants went out of business. Worst of all, gripped by paralyzing fear and whipped into a frenzy by government officials and so-called medical "experts" eager to push their apocalyptic narrative, people began to view their neighbors not as human beings, but as loci of disease. Mass hysteria was in full swing.

42.     Indeed, as the *Wall Street Journal* insightfully observed, Americans were gripped by "Covid mania," i.e., "put[ing] one illness above all other problems in society."[3]

43.     Even as the weather warmed and Summer 2020 beckoned, officials and politicians in many States, including New York, refused to release their COVID-19 stranglehold on their citizens-turned-subjects, and instead continued to maintain tyrannical lockdowns and closures, all the while fueling "Covid Mania." It soon became apparent that the course of tens of millions of childhoods had forever changed both academically and socially, tens of thousands of small businesses would not survive, and that the relationship between government and governed had drastically deteriorated.

## II.     The Devastating Impact of Draconian COVID-19 Measures on Education

44.     Amidst this government-induced crisis of lockdowns, fear, and panic starting in March 2020, school districts across the United States cancelled in-person academic instruction and

---

3  Joseph A. Ladapo, "An American epidemic of 'Covid Mania' " *Wall Street Journal* (April 19, 2021), https://www.wsj.com/articles/an-american-epidemic-of-covid-mania-11618871457

athletics for the remainder of the 2019-2020 school year. Instead, districts shifted to full-time remote learning that immediately proved ineffective, caused deleterious effects on the educational development of children, and put working parents in impossible situations. Even at present, experts are still struggling to piece together the long-term impact of these disastrous school closures on children who can never get these formative and precious times back.

45. Notably, by and large, school districts, district leadership teams, and rank-and-file teachers *supported* the cancellation and indefinite suspension of in-person learning. The OPCSD Parties—who enthusiastically fell in line with the prevailing COVID-19 orthodoxy preached by so-called medical "experts" pertaining to school closures, masking, and "social distancing"—were no exception, taking a hard line on the issue of keeping schools closed and fiercely opposing any efforts to reopen their schools to full-time in-person learning.

46. Indeed, OPCSD cancelled in-person academic instruction from March 2020 until the conclusion of the 2019-2020 school year in June, and then adopted the hybrid/remote model for the 2020-2021 school year, which provided only part-time in-person learning with substantial amounts of mostly useless at-home virtual instruction.

47. Notably, as of September 4, 2020—when Governor Cuomo issued Executive Order 202.60, "authoriz[ing] schools statewide to be open for instruction, effective September 1, 2020"—OPCSD had the option of restoring full-time in-person learning, but declined to do so.

48. The OPCSD Parties' decision to eschew full-time in-person learning was *not* in the best interests of OPCSD students. As generally and widely agreed amongst education experts, hybrid/remote learning provides children with an inferior education product because this model deprives them of pedagogical and social benefits that can only be realized from face-to-face interaction. This was true before the Pandemic, it was true during the Pandemic, and it remains

true at present. In fact, on many "school" days, this remote model leaves children to self-study without *any* instruction, remote or otherwise. The difference in the quality of in-person versus remote learning, as education experts agree, is vast.[4]

49.     Yet, by the end of March 2021, over a year since the Pandemic struck, there was no end in sight to OPCSD's use of the hybrid/remote model. With each passing day, the OPCSD Parties were inflicting long-term damage to the academic and social development of Dinero's children and OPCSD's other students. Against this backdrop, Dinero—who learned the value of taking the initiative from the Marine Corps—decided to take matters into his own hands. And, but for Dinero's bold legal intervention, which the OPCSD Parties vehemently opposed (but ultimately in defeat), OPCSD would have remained on a hybrid/remote model not only for the remainder of the 2020-2021 school year, but very likely beyond, into the 2021-2022 school year. Simply put, Dinero saw a school district that was putting the selfish interests and irrational fears of adults ahead

---

4  Emily C. Hanno et al., "School Learning Format and Children's Behavioral Health During the COVID-19 Pandemic," *Graduate School of Education, Harvard University* (April 2022), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2787966?resultClick=1; *see also* Jill Anderson, "The Negative Effects of Remote Learning on Children's Wellbeing," *Harvard Graduate School of Education* (Feb. 18, 2022) (Before COVID hit, Professor Stephanie Jones and Lecturer Emily Hanno were already tracking young children's development as part of the Early Learning Study at Harvard . . . . In their newest findings, they share that families reported a rise in temper tantrums, anxiety, and a poor ability to manage emotions . . . ."), https://www.gse.harvard.edu/ideas/edcast/22/02/negative-effects-remote-learning-childrens-wellbeing; Helaine Olen, "It's time to admit it: Remote education is a failure," *Washington Post* (Dec. 2, 2020) ("All of this could have, and should have been known . . . . A 2015 study of online charter schools by the Center for Research on Education Outcomes, determined that students did better in math and reading when attending in-person schools, and concluded 'academic benefits from online charter schools are currently the exception rather than the rule.' One of the study's authors, in a call with reporters, said the math results were so dismal it appeared as if 'the student did not go to school for the entire year.' "), https://www.washingtonpost.com/opinions/2020/12/02/remote-education-failure-coronavirus/; Tawnell D. Hobbs and Lee Hawkins, "The Results Are in For Remote Learning: It Didn't Work," *Wall Street Journal* (June 5, 2020), https://www.wsj.com/articles/schools-coronavirus-remote-learning-lockdown-tech-11591375078

of the more pressing educational needs of children, and took the bold action that the situation required.

**II. The Article 78 Proceeding and The Reopening**

50.     By Petition dated March 31, 2021 and filed in Erie County Supreme Court under Index No. 804310/2021, Dinero, through his attorneys Todd Aldinger ("Aldinger"), Jeffrey Reina, and Paul Cambria, filed a Petition and Complaint commencing the Article 78 Proceeding against OPCSD, the Board, and several State defendants, captioned *ROBERT DINERO, on behalf of his minor children and on behalf of all others similarly situated* (Petitioner/Plaintiff), For Judgment Pursuant to Article 78 of the CPLR, Article XI, § 1 of the New York State Constitution, and/or Article I, § 11 of the New York State Constitution v. *ORCHARD PARK CENTRAL SCHOOL DISTRICT; BOARD OF EDUCATION OF THE ORCHARD PARK CENTRAL SCHOOL DISTRICT; ANDREW M. CUOMO, GOVERNOR OF NEW YORK; NEW YORK STATE DEPARTMENT OF HEALTH; and NEW YORK STATE EDUCATION DEPARTMENT* (Respondents).

51.     As set forth in the introductory paragraph of the Petition, "[t]his is a special proceeding brought under Article 78 of the CPLR and/or a declaratory action brought under CPLR § 3001 seeking injunctive relief to enjoin Respondents from continuing to impose a hybrid/remote learning model on students at Orchard Park . . . . this action . . . seeks . . . to require that Orchard Park provide an option for five days per week of in-person education to all students whose parents that their students receive such in-person education." (Petition, NYSCEF #1, ¶ 1)

52.     The Petition succinctly captured the problem with the hybrid/remote model, and why this issue was so important to Dinero as a father actively involved with the welfare of his children:

Under Orchard Park's Hybrid/Remote Learning Model, instead of being afforded daily classroom instruction, the many Orchard Park students (i.e. grades 4-12) are only afforded remote learning options on certain school days, without the benefit of instruction by a competent teacher. For these Orchard Park students, the Hybrid/Remote Learning Model only affords students with in-person instruction every other day; on every other day students are assigned independent, remote school work, with no instruction whatsoever.

(*Id*. ¶¶ 22-23).

53.     In support of the Petition, Dinero's attorneys also submitted his Affidavit ("Dinero's Affidavit").

54.     Dinero's Affidavit contained blunt but entirely valid criticism of the OPCSD Parties' hybrid/remote model, for example: "Every other day my children do not attend school and receive no instruction whatsoever . . . . [which] has greatly harmed the academic progress of my children." (Dinero Affidavit, NYSCEF #11, ¶¶ 9-10).

55.     Dinero's criticism was warranted—both O.C.D. and V.M.D. saw substantial grade drops under the hybrid/remote model from their usual "A" caliber work, and the model also deleteriously impacted their mental health. (*Id*. ¶¶ 11-19).

56.     By Decision & Order dated May 13, 2021, the Honorable Emilio Colaiacovo, J.S.C., ordered, in pertinent part, that the "Orchard Park Central School District shall provide full-time, in-person learning five (5) days per week effective May 17, 2021." (Decision & Order, NYSCEF #98 at p. 35).

57.     Justice Colaiacovo also delivered a clear rebuke to OPCSD and other proponents of hybrid/remote learning:

Guidelines designed with "may prevent", "should work", and "possibly contain" expectations are poor excuses to use, when the end results ultimately cheat students from their education, ability to socially interact with others, and otherwise grow mentally and physically. To develop insurmountable guidelines disproportionate with the risk cannot be considered reasonable or rational.

(*Id*. at pp. 34-35).

58.     From this point forward, there was a target on Dinero's back, a target at which the Defendants took dead aim.

### III.     Retaliatory Acts Taken Against Dinero and His Children

#### a.     November 2021: The OPCSD Parties Selectively Enforce Their Mask Mandate Against Dinero and Lilleck Unlawfully Prohibits Dinero from Entering OPCSD Buildings In Order to Silence His Criticism

59.     Prior to November 9, 2021, Dinero's Criticisms were a source of constant frustration for the OPCSD Parties. Dinero frequently attended the monthly meetings of the Board, and frequently spoke at the Board meetings in a manner highly critical of the OPCSD Parties (particularly but not limited to Lilleck), highly critical of the OPCSD Parties' COVID-19 policies, protocols, and rules, and in a manner highly critical of their educational policies.

60.     Dinero's Criticisms were particularly withering with respect to OPCSD's mask-wearing rules, OPCSD's school closures, and Lilleck's poor leadership.

61.     The Criticisms, together with his audacity in bringing and ultimately winning the Article 78 Proceeding to force the Reopening, enraged Lilleck, the members of the Board, and other individuals on the OPCSD leadership team, and motivated them to take adverse action against him. What would come next—Dinero's continued insistence on speaking out against the OPCSD Parties and his ultimate victories in the Criminal Prosecutions—would only add to their frustration and desire to harm Dinero.

62.     On November 9, 2021, Dinero attended the Board Meeting held at Eggert Elementary School (the "November 9 Board Meeting").

63.     When Dinero arrived at the School building, he was not wearing a mask; however, numerous other individuals were also not wearing masks. An OPCSD employee provided a mask to Dinero, which he wore.

64.     Once inside the School building for the Meeting, Dinero again observed that numerous other individuals were not wearing their masks, and so took off his mask. At that point, Dean L. Ramirez, Assistant Superintendent for Personnel and Pupil Services, approached Dinero in an aggressive manner and demanded that Dinero put on a mask. When Dinero pointed out that numerous other individuals were not wearing masks, Ramirez told Dinero that this didn't matter and warned Dinero that he would be arrested if he did not leave the Meeting. Dinero, together with the numerous other individuals who were not targeted for mask enforcement, continued to remain maskless. The Meeting then came to order, and both Board President Christine Gray-Tinnesz and Lilleck demanded that Dinero wear a mask. Dinero, observing that numerous other attendees were neither wearing masks nor being threatened with arrest, declined to wear a mask and called the Board members "cowards" and "hypocrites." In response, the Board adjourned the Meeting without conducting any actual business. At no time during this Meeting did Dinero make any physical contact with or threaten anyone.

65.     By letter dated November 12, 2021 (the "First Prohibition Letter"), Lilleck "hereby **prohibited** [Dinero] from being in any of the District's school buildings and attending any activity or event taking place within District school buildings including Board meetings." (Emphasis added). Lilleck instructed that "[i]f you need to attend an activity/event within a District building, you must submit a written request to my office" (the "Prohibition"). Lilleck claimed that the Prohibition was justified by purported "fail[ure] to comply with the District's COVID-19 protocols [and] disrespectful, disorderly, and hostile conduct."

66.     Lilleck also threatened law enforcement intervention and criminal charges if Dinero violated Lilleck's unilateral and unlawful decree.

67.     Conveniently, nowhere in First Prohibition Letter did Lilleck mention that Dinero

20

was the only person targeted for mask enforcement and threat of arrest. The Letter also did not indicate whether Lilleck had made the determination alone or in consultation with the Board, did not offer Dinero an opportunity to have a hearing about Lilleck's determination (which effectively stripped Dinero of his legal and constitutional rights to attend Board meetings), did not state any endpoint for the Prohibition, did not provide any opportunities for appeal of the Prohibition, and did not provide any statutory authority or other legal basis for the Prohibition.

68.     Also of note, Lilleck copied Wehrfritz, Fitzgerald, the Board, all OPCSD Principals, and Melanie Beardsley of the law firm Webster Szanyi LLP ("Beardsley"—OPCSD's counsel) on the First Prohibition Letter. Lilleck's inclusion of then-chief Wehrfritz and then-Captain Fitzgerald was gratuitous, and an indication that Lilleck was setting Dinero up for an arrest. The inclusion of Fitzgerald was particularly odd, since, at the time, Fitzgerald was not Chief of TOPPD and was subordinate to Wehrfritz. To the extent Lilleck had any legitimate reason to copy TOPPD (which he did not), there would have been no need to copy Wehrfritz *and* Fitzgerald.

69.     The Prohibition also accomplished another important objective for the OPCSD Parties: unconstitutionally excluding Dinero from Board meetings, thereby accomplishing OPCSD's objective of silencing Dinero.

70.     As both the content and excessive recipient list of the First Prohibition Letter made clear, Dinero now had a target on his back not only for the Article 78 Proceeding and his leadership of parental resistance to OPCSD's arbitrary and draconian COVID-19 protocols, but also for his withering criticisms of the Board and Lilleck (i.e., calling them "cowards" and "hypocrites").

71.     From this point forward, OPCSD employees had a standing order from Lilleck to call the police on Dinero, and, if at all possible, have him arrested for any conduct that could even be *perceived* or *framed* as a violation of the Prohibition.

72.     Nonetheless, after receiving the First Prohibition Letter, Dinero worked diligently with his attorney Aldinger to communicate with Lilleck in a firm but respectful manner, in order to address the Prohibition and achieve a mutually acceptable understanding. Unfortunately, the OPCSD Parties did not reciprocate Dinero's respectful approach and instead chose to continue on their destructive path of retaliation.

73.     By letter to Lilleck dated November 22, 2021, Aldinger responded to the First Prohibition Letter by pointing out to Lilleck, *inter alia*, that the Prohibition lacked any statutory basis and that he had failed to provide Dinero with any opportunity to appeal, writing "there is no legal basis for you [Lilleck] to unilaterally prohibit Mr. Dinero from attending school board meetings in this manner, which is wholly basis on your suspicion that he may violate the [Code of Conduct] in the future." Indeed, the First Prohibition Letter was clearly a prior restraint under the First Amendment. And as Aldinger further pointed out, although the Board can pass rules relating to the conduct of Board meetings, "a superintendent does not have the legal right to prohibit an individual from attending future board meetings . . . ." Aldinger concluded his letter by requesting that Lilleck rescind the Prohibition and allow Dinero to attend Board meetings.

74.     Unsurprisingly, and as subsequent events would demonstrate, Aldinger's letter to Lilleck had fallen on deaf ears.

**b.  December 2021: Lilleck Doubles Down on the Prohibition, the First Two False Arrests Occur at Lilleck's Behest, Dinero Loses his Second Amendment Rights, Lilleck Twists Dinero's Podcast Remarks, and Dinero Learns of the Behind-the-Scenes Efforts of Lilleck and Fitzgerald to Coordinate His Arrest and Prosecution**

75.     In response to Aldinger's letter, Beardsley sent a letter to Aldinger and Dinero, copying Lilleck, dated December 2, 2021 (the "Second Prohibition Letter") stating in relevant part that "Mr. Dinero's ban from being in any District school building **will continue** until (i) he

22

complies with the District's Code of Conduct and COVID-19 protocols or (ii) he complies with the District's Code of Conduct and the COVID-19 protocols are no longer in place." (Emphasis added).

76.     Dinero and Aldinger correctly and reasonably interpreted the Second Prohibition Letter to mean that if Dinero wore a mask and did not violate some other aspect of OPCSD's Code of Conduct or COVID-19 protocols, that Dinero would be permitted to attend Board meetings. As Aldinger later testified at trial, he correctly advised Dinero that he was allowed to enter OPCSD Property for Board meetings so long as he was in compliance with the Code of Conduct and the protocols.

77.     In the meantime, Dinero went about his daily routine of working and helping his children. Part of this daily routine was dropping his children off at school and afterschool activities. Accordingly, on December 9, at 6:00 p.m., correctly and reasonably relying on Beardsley's representations in the Second Prohibition Letter (that the Prohibition would continue only so long as Dinero was not in compliance with OPCSD's Code of Conduct and COVID-19 protocols), Dinero dropped off two of his sons, R.B.D. and R.E.D, for afterschool wrestling practice at Orchard Park Middle School.

78.     At the drop-off, Dinero was met by Kenneth Walker ("Walker") of Allied Security (the outside provider of OPCSD's security services). Walker was *not wearing a mask*. Dinero informed Walker that he was dropping his kids off for wrestling practice and then entered the building with his children to bring them into the gymnasium as the maskless Walker threatened to have Dinero arrested. Walker memorialized this interaction in his "Daily Activity Report" for December 9.

79.     As captured in the Daily Activity Report, Walker (acting on Lilleck's orders),

immediately called the police (TOPPD) on Dinero, then called Middle School Principal Aaron Grupka ("Grupka") and connected him to TOPPD.

80.     According to the Daily Activity Report, at 6:05 p.m., Dinero exited the building and left; TOPPD officers arrived on scene shortly thereafter but "Dinero was already off the property."

81.     Demonstrating the OPCSD Parties' astounding bad faith, the Daily Activity Report confirms that, at 7:45 p.m., "**Mr. Dinero picked up his boys the twins, peacefully—we now have an understanding—Mr. Grupka approves**." (Emphasis added). But, as set forth hereinafter, less than one week later, Lilleck would have Dinero arrested retroactively for this drop-off and pickup interaction, even though, as the Daily Activity Report proves, Dinero's drop-off and pickup was part of an "understanding" and "approve[d]" by none other than the Middle School Principal.

82.     Further demonstrating the OPCSD Parties' bad faith, the First Prohibition Letter stated: "Although you are not banned from being on District property for any outdoor event/activity (**such as picking up or dropping off your children**), you are expected to conduct yourself in a respectful and orderly manner and comply with the District's Code of Conduct." (Emphasis added). Yet, when Dinero did exactly that—drop off and pick up his children—Walker called the police.

83.     This incident with Walker was yet another in what would become a long line of "bait and switch" tactics employed by the OPCSD Parties in cooperation with the TOPPD Parties—Lilleck, or others acting at his behest, would frequently issue confusing warnings to Dinero or give him permission to do engage in a certain action (such as "understanding" and "approv[al]"), then have him arrested and prosecuted anyway for not heeding these warnings to

their satisfaction or for exceeding the scope of their "permission," when the plan all along was to set a trap for Dinero. Indeed, although TOPPD did not actually arrest Dinero on December 9, Walker's bad faith call to TOPPD set the stage for Dinero's inevitable series of arrests (the False Arrests) that Lilleck and other members of OPCSD leadership had planned all along with TOPPD.

84.    Indeed, the next week, on the afternoon of December 13, Dinero emailed Lilleck and asked for the time and place of the Board Meeting scheduled for the following evening. Lilleck responded a short while later: "The meeting is at [Orchard Park High School] at 7 p.m. tomorrow evening. As a reminder, you are not permitted inside any district building. If you are on district property at any time, you must follow all components of our Code of Conduct." Dinero then responded shortly after, writing: "Dave, you are wrong again. I will see you tomorrow."

85.    The next night, December 14, again correctly and reasonably relying on Beardsley's representations in the Second Prohibition Letter (again, that the Prohibition would continue only so long as Dinero wasn't in compliance with OPCSD's Code of Conduct and COVID-19 protocols), and also relying on the successful drop-off and pickup on December 9, Dinero met Aldinger in the High School parking lot at around 6:50 p.m. They both put on masks, and together walked into the School for that evening's Board Meeting with Dinero still **wearing a mask** as he entered the School (as Lilleck would later admit at trial). Dinero did not make physical contact with or threaten anyone.

86.    But despite Dinero's compliance with OPCSD's Code of Conduct and COVID-19 protocols, Purucker and Bowersox, who were apparently waiting for Dinero to arrive and acting on instructions from Lilleck (who knew Dinero would be coming from the December 13 email exchange), as well as Wehrfritz and Fitzgerald—all of whom together, had coordinated well in advance—summarily arrested Dinero the moment he walked through the doors to the School

("False Arrest #1").

87.     Purucker instructed Dinero to turn around, placed him in handcuffs, advised him that he was being arrested for Criminal Trespass, and then, with Bowersox, escorted down a hallway to hand him off to Gehring, who transported Dinero to TOPPD headquarters in the back of a police car.

88.     As Purucker handcuffed Dinero, Aldinger tried to explain to Purucker that Dinero was in fact permitted to be in the building and even tried to show Purucker the Second Prohibition Letter, all to no avail.

89.     As Dinero was being arrested and handcuffed, he was *still* wearing a mask. In fact, at no time during the December 14 Board Meeting did Plaintiff remove his mask, violate any OPCSD COVID-19 protocol, or violate any aspect of the OPCSD Code of Conduct.

90.     Purucker's arrest of Dinero was remarkable in that it occurred within seconds of Dinero entering the School and without any opportunity for discussion of alternatives. As Aldinger would later recall at trial, the arrest occurred after Dinero had taken no more than "two or three steps" into the School.

91.     Also remarkable was the fact that at least twenty other individuals entered the building that evening maskless and refused to wear masks. None of these individuals were arrested. This was consistent with the OPCSD Parties' lax enforcement of their supposed mask rules, both before and after False Arrest #1: students, parents, and faculty routinely attended sporting events and practices, Board Meetings, and other OPCSD events without wearing masks, but Dinero was the only person targeted for not wearing a mask.

92.     Dinero was charged with one count under Penal Law § 140.10(b) (Criminal Trespass in the 3rd Degree—a "B" misdemeanor).

93.     With False Arrest #1, Defendants' retaliation against Dinero escalated to a new and far more aggressive stage—the Criminal Prosecutions.

94.     The Criminal Prosecution arising out of False Arrest #1 was assigned docket # 21-036846 and an additional case # 21120187 in the Orchard Park Town Court (Criminal Prosecution #1). The Prosecution was ultimately transferred to Orchard Park Village Court and assigned case # 22060033.

95.     The Criminal Information/Complaint for False Arrest #1/Criminal Prosecution #1, filed in Orchard Park Town Court and dated December 14, stated in pertinent part: "I, **DAVID LILLECK** . . . accuse **ROBERT F. DINERO** . . . and charge that on or about Tuesday, December 14, 2021 . . . at about 7:11 p.m . . . . The defendant . . . did knowingly enter and remained unlawfully in the Orchard Park High School after being prohibited from being in any of the District's school buildings including Board meetings" (emphasis added).

96.     Lilleck also provided a Supporting Deposition, in which he stated: "Tuesday, December 14, 2021, at no time did I give Robby Dinero permission to enter the OPCSD HS for the BOE meeting. As a result of his previous conduct he has been prohibited from being in any District buildings and attending any activities or events taking place within District buildings, including Board of Education meetings." This Supporting Deposition was false.

97.     False Arrest #1 and Lilleck's knowingly false allegations were disturbing enough for Dinero. However, nothing could have prepared him for what happened next, as Defendants would have him arrested again two weeks later, followed by a stunning revelation from a Lieutenant in TOPPD about the corrupt coordination between Lilleck and Fitzgerald.

98.     Although it had taken Lilleck and Fitzgerald longer than they would have liked to have Dinero arrested, they had finally put their corrupt plan into motion, and were just getting

started. On December 28, with the approval of Fitzgerald, Wehrfritz, and Rizzo (at the time Purucker's direct supervisor), Purucker effectuated a second False Arrest, serving Dinero with a Criminal Summons dated December 27 for one count under Penal Law § 140.10(b) (Criminal Trespass in the 3rd Degree—a "B" misdemeanor) in connection with Dinero's drop-off of his sons at wrestling practice on December 9 (False Arrest #2).

99.     The Criminal Prosecution arising out of False Arrest #2 was assigned docket # 21-036243 and an additional case # 21120027 by the Orchard Park Village Court (Criminal Prosecution #2).

100.     False Arrest #2 was particularly bizarre, considering Walker's note from December 9 that "**Mr. Dinero picked up his boys the twins, peacefully—we now have an understanding—Mr. Grupka approves**." (Emphasis added). Yet, over two weeks later, and after False Arrest #1, Lilleck, in an effort to harm Dinero, retroactively determined that the December 9 drop-off now merited a call to TOPPD so that Dinero could be prosecuted for *dropping off his children* despite the fact that Grupka had *approved* the understanding between Walker and Dinero.

101.     Not only did False Arrest #2 contradict Grupka's approval, the timing of the Arrest was highly suspicious. Indeed, Lilleck inexplicably waited over two weeks to press charges for the December 9 drop-off, and Lilleck only did so after Dinero infuriated Lilleck by attending the December 14 Board Meeting in defiance of Lilleck's unlawful Prohibition.

102.     Indeed, the Criminal Information/Complaint for False Arrest #2/Criminal Prosecution #2, filed in Orchard Park Village Court and dated December 14, stated in pertinent part: "I, **DAVID LILLECK** . . . hereby accuse **ROBERT F. DINERO** . . . that on or about Thursday, December 9, 2021 . . . at about 5:56 PM . . . [Dinero] did knowingly enter and remain unlawfully in the Orchard Park Middle School." (Bold in original).

28

103.    Moreover, the Supporting Deposition to the Criminal Information/Complaint, also dated December 14, and signed by Lilleck under criminal penalties for making false statements, stated in pertinent part: "On Thursday, December 9, 2021, I was informed by the MS principal that Robby Dinero was/had entered the MS. Upon this information, I witnessed him in our MS on our cameras. Mr. Dinero was prohibited and continued to be prohibited from being in any of our school district's buildings and he did not have permission from me to enter the MS."

104.    Tellingly, Lilleck only sought Dinero's arrest for the *December 9* drop-off after Dinero came to the *December 14* Board Meeting, and only signed a supporting deposition a full five days after the drop-off. Also tellingly, Lilleck alluded to having been informed by Grupka that Dinero had entered the MS on December 9, but this was the very same Grupka who was aware that there was an understanding between Walker and Dinero, and approved that understanding.

105.    Lilleck also recruited Walker to provide a Supporting Deposition, in which Walker conveniently left out any reference to his Daily Activity Report, including Walker's recollection that the drop-off and pickup had been resolved "peacefully," and that Walker had an "understanding" with Dinero approved by Grupka. Left unsaid by Walker was the fact that he (Walker) was not wearing a mask during the December 9 encounter.

106.    The collateral consequences of the False Arrests were swift and severe, and included Dinero's loss of his Second Amendment rights. By letter to Dinero dated December 16, 2021, the County of Erie Pistol Permit Department wrote: "Our department has received a report from the New York State Division of Criminal Justice Services that you have been charged with a violation of the New York State Penal Law. Therefore, your Pistol License . . . has been suspended by the Licensing Officer for Erie County." Dinero complied with the surrender directive and, on January 3, 2022, turned in his revolver to TOPPD.

29

107.    On December 23, one week after receiving the notification to surrender his pistol license, Dinero appeared on a local podcast called *The Financial Guys*. During the podcast, he rhetorically stated that "every single principal that's acting right now, every administrator, every principal, every superintendent, needs to be shot and put out to pasture" (the "Podcast Statement"). Dinero did not mention or reference any specific person by name. The Podcast Statement was a valid exercise of Dinero's First Amendment rights, and violated no law.

108.    The following week, December 30, Lilleck sent another letter to Dinero, this time regarding the Podcast Statement, in order to seize upon the Statement as a means of extending the Prohibition (the "Third Prohibition Letter"). Falsely construing Dinero's general statement as a threat to specific OPCSD personnel, Lilleck asserted that "[t]hreats such as these to our principals, administrators, and district leaders are extremely disturbing and have no place in our school district." Lilleck continued: "**As a result of your conduct, you are hereby prohibited from being in any of the District's school buildings or on any school grounds effective immediately.**" (Emphasis in original). Lilleck further required that Dinero could only enter OPCSD Property by "written permission from me." As with the prior Prohibition Letters, the Letter threatened law enforcement intervention and criminal charges. The Third Prohibition letter was an unconstitutional prior restraint under the First Amendment. And, once again, Lilleck gratuitously copied Wehrfritz, Fitzgerald, the Board, all OPCSD Principals, and Beardsley.

109.    The Third Prohibition Letter stated nothing about the duration of the Prohibition or that the Prohibition would last for the entire school year—but Lilleck would soon arbitrarily alter the terms of the Prohibition without any explanation.

110.    Lilleck's distortion of Dinero's Podcast Statement was preposterous; Lilleck intentionally distorted a common and well-known turn of phrase ("shot and put out to pasture")

in a literal and demonstrably absurd manner to make the false and libelous allegation against Plaintiff that he had threatened the OPCSD Parties. Such hyperbole is fully protected by the First Amendment. *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 706, 708 (1969) (holding statement "if they ever make me carry a rifle the first man I want in my sights is L.B.J. [President Lyndon B. Johnson]" was hyperbole, not threat).

111.    Also after the Podcast Statement, a TOPPD Lieutenant (not a Defendant in this action) approached Dinero in confidence and informed him that Lilleck and Fitzgerald had been planning for a long time to have Dinero arrested and prosecuted because of his criticism of Lilleck and the other OPCSD Parties. The Lieutenant stated that normally TOPPD would not get involved in a dispute such as this involving mask-related and other issues relating to alleged violations of the OPCSD Code of Conduct rather than actual criminal violations under the Penal law. The Lieutenant explicitly stated to Dinero that the only reason he had been arrested was because of the corrupt relationship between Lilleck and Fitzgerald. As the Lieutenant advised, Fitzgerald had instructed the Lieutenant to speak to the Erie County District Attorney's Office (the "ECDA") to get charges filed against Dinero for the Podcast Statement. Even more startling, the Lieutenant told Dinero that after the ECDA declined to file charges, Fitzgerald then instructed the Lieutenant to contact the United States Attorney's Office for the Western District of New York to see if federal charges against Dinero were possible.

112.    Notably, throughout 2021, it was well-known that Fitzgerald was preparing to take command of TOPPD following Wehrfritz's anticipated retirement. At the time Fitzgerald gave these instructions to the Lieutenant, Fitzgerald was already wielding de facto authority as Chief.

113.    The Lieutenant's revelations to Dinero were astonishing: there was now no doubt whatsoever that the instructions to "get" Dinero were coming straight from the top.

114.     As 2021 drew to a close, Lilleck's message of intimidation to Dinero, backed by the full force of TOPPD, was loud and clear—we will get you.

     **c.**  **January and February 2022: The Prohibition Continues, Defendants Secure the First False Order of Protection, the Third False Arrest Occurs at Lilleck's Behest, and Defendants Escalate Their Campaign of Intimidation by Targeting Four of Dinero's Children for Coordinated Retaliation**

115.     Shortly after the New Year, Dinero sought written permission from Lilleck to drop-off and pick up his two sons R.B.D. and R.E.D at Ellicott Elementary School. In an email sent on the afternoon of January 3, 2022, Dinero wrote: "Dave, I am writing to request permission to drop off and pick up my kids from school/school functions. I will not exit the vehicle while dropping off or picking them up. I will comply with the district code of conduct while on school property."

116.     Although Lilleck had informed Dinero in the Third Prohibition Letter that Dinero *could* enter OPCSD Property by "written permission from me," Lilleck, suddenly and without any change in circumstances since the Podcast Statement and the Third Prohibition Letter, informed Dinero that the Prohibition would extend through the end of the school year, writing back to Dinero on January 3: "Mr. Dinero, Your request is denied. Please be advised that your request to be on District property to drop off and pick up your kids from school and/or school functions is denied and my decision with respect to this request will be in place through the end of the 2021-2022 school year unless otherwise advised."

117.     In order to support this specious reversal of policy after the fact, Lilleck later claimed in a Supporting Deposition dated January 14, 2022 that the Podcast Statement was a "threat involving gun violence."

118.     Yet, Dinero was never arrested or charged with any offense relating to a gun violence threat. As Lilleck surely realized, this was because Dinero never threatened anyone with "gun violence." To the contrary, Lilleck was aware that ECDA declined to file charges for the

Podcast Statement and understood that Dinero violated no law in making the statement.

119.    In the meantime, on January 13, 2022, Dinero appeared before the Hon. Edward A. Pace ("Judge Pace") in Orchard Park Town Court for his arraignment on the First and Second False Arrests. At arraignment, Judge Pace issued the First of the False Orders of Protection, requiring Dinero to stay off OPCSD Property, but with the carve-out that "MR. DINERO IS ALLOWED TO DROP OFF AND PICK UP HID CHILDREN FROM THE FOLLOWING SCHOOLS: ORCHARD PARK HIGH SCHOOL, ORCHARD PARK MIDDLE SCHOOL AND ELLICOTT ELEMENTARY."

120.    Despite the constant threat of arrest and prosecution looming over him, Dinero had no choice but to drop off and pick up his sons from Ellicott Elementary School, but could at least do so with the comfort of Judge Pace's carve-out permitting him to drop off and pick up his children. Accordingly, on January 14, relying on Judge Pace's carve-out in the First False Order of Protection, Dinero dropped off his sons at the School shortly after 9:00 a.m., and then returned to pick them up for early dismissal shortly after 11:00 a.m. Predictably, Lilleck, demonstrating that he would stoop to any level to harass Dinero in retaliation for his protected speech and petition for redress of grievances, immediately called TOPPD and instructed that Dinero be arrested again.

121.    Lilleck's call to TOPPD displayed flagrant disregard for Judge Pace's carve-out in the First False Order of Protection, which specifically permitted Dinero to drop off and pick up his children.

122.    Indeed, rather than demonstrating any disregard for the law by Dinero, Lilleck's call to TOPPD demonstrated *his* disregard for the law and *his* desire to "get" Dinero at all costs.

123.    The next day, January 15, 2022, Mazur effectuated the arrest requested by Lilleck, serving Dinero with a Criminal Summons dated January 14, 2022 for one count under Penal Law

§ 140.05 (Trespass — a Violation) in connection with the previous day's drop-off and pickup (False Arrest #3).

124.    False Arrest #3 marked a new level of vindictiveness, even for Lilleck, as False Arrest #3 was based entirely on Lilleck's complaint that Dinero had trespassed on School grounds, *even though Judge Pace had specifically authorized drop-offs and pickups*. Lilleck, apparently, believed that he had greater authority than Judge Pace. The Criminal Information/Complaint for False Arrest #3/Criminal Prosecution #3, filed in Town of Orchard Park Town Court and dated January 14, stated in pertinent part: "I, **Police Officer KRISTEN A. MAZUR** . . . accuse **ROBERT F. DINERO** . . . that on or about Friday, January 14, 2022. . . at about 9:17 AM . . . [Dinero] did enter Orchard Park Central School District property at Ellicott Elementary School on 1/14/2022 at approx 0917 and 1138 hours. The defendant was aware that he was banned from all school district property." (Bold in original).

125.    The Criminal Prosecution arising out of False Arrest #3 was assigned docket # 22-001329 and an additional case # 22010101 by the Orchard Park Town Court (Criminal Prosecution #3). The Prosecution was ultimately transferred to Orchard Park Village Court and assigned case # 22060034.

126.    A Supporting Deposition to the Criminal Information/Complaint, also dated January 14, and signed by Lilleck under criminal penalties for making false statements, stated in pertinent part: "On December 30, 2021 Mr. Robert Dinero was issued a letter from [OPCSD] which banned him from being on school property. Subsequently, Mr. Dinero sent a written request for permission to pickup and drop-off his children. Due to his threat involving gun violence that request was denied. Most recently, Dinero was notified that the decision to ban him from school property would extend through the end of the school year."

127.    Lilleck also secured Supporting Depositions from two other OPCSD employees, both of which captured the absurdity of False Arrest #3. A Supporting Deposition dated January 14 from an OPCSD employee Colleen Hylkema ("Hylkema") stated: "While working dismissal duty in the school parking lot, Mr. Dinero engaged in conversation with me while he was waiting in the front loop of the school to pick up his boys. This was on 1/14/22 at 11:38 a.m." A Supporting Deposition also dated January 14 from an OPCSD employee Craig Mielcarek ("Mielcarek") stated: "On 1/14/22 at approximately 0917 Hrs while working as the School Monitor (Ellicott Elm) I observed Mr. Dinero dropping off his two children. Mr. Dinero walked his children to the front door where I met them outside and allowed the two students to enter the building. Mr. Dinero asked me what time dismissal was. I advised him that school was going to be dismissed at 11:20 a.m. Mr. Dinero then left without incident."

128.    However, Defendants' campaign of retaliation against Dinero would not be limited to targeting him—after False Arrest #3, Defendants quickly escalated to targeting Dinero's children.

129.    Indeed, on the morning January 25, 2022, the OPCSD Parties, demonstrating just how organized they were in pursuing their campaign of retaliation against Dinero and his family, targeted four of Dinero's children at two separate schools at the same time, subjecting them to bullying, harassment, and intimidation under the guise of enforcing a mask mandate that was not in effect that morning (the "January 25 Targeting"). These actions were all orchestrated by Lilleck, who at all times on this morning was aware of what was happening.

130.    As of January 25, 2022, Dinero's oldest daughter, O.C.D., was a senior attending Orchard Park High School; Dinero's oldest son, V.M.D., was a sophomore at the School; and two of Dinero's younger sons, R.B.D. and R.E.D., attended nearby Ellicott Elementary School.

131.     On January 25, 2022, O.C.D., V.M.D., R.B.D., and R.E.D. attended school without masks.

132.     On that morning, at the High School, January 25, O.C.D. and V.M.D. justifiably and correctly believed that they were not required to wear a mask since the previous day, January 24, Justice Thomas Rademaker of the Nassau County Supreme Court had struck down the New York Commissioner of Health's mask mandate (10 NYCRR §§ 2.60, 2.60(a)), which included schools (*Demetriou et al. v. New York State Dep't of Health et al.*, Index No. 616124/2021), and no Stay was yet in effect.[5]   Justice Rademaker had ruled that 10 NYCRR §§ 2.60, 2.60(a) "is a law that was promulgated and enacted unlawfully by an Executive branch state agency, and therefore void and unenforceable as a matter of law."

133.     Indeed, at the beginning of the school day on January 25, the mask mandate was not in effect. Only after the school day had concluded on January 25 did the Appellate Division, Second Department issue a Stay of Justice Rademaker's decision.[6]

134.     As of January 25, Hafner was the Principal of Orchard Park High School.

135.     On this day, many of O.C.D.'s and V.M.D.'s classmates were not wearing masks at all, or were wearing masks below their noses. These classmates were rarely, if ever, targeted for mask enforcement by Hafner or any other OPCSD employees.

136.     And, every day prior to January 25, many of O.C.D.'s and V.M.D.'s classmates

---

5  Daniel Trotta and Brad Brooks, "*New York judge strikes down mask mandate*," Reuters (Jan. 25, 2022), https://www.reuters.com/world/us/new-york-state-mask-mandate-struck-down-by-judge-congressman-2022-01-25/; *see also* Bernadette Hogan and Bruce Golding, "*Long Island judge rules Gov. Hochul's mask mandate as 'unlawful,*" New York Post (Jan. 24., 2022), https://nypost.com/2022/01/24/long-island-judge-throws-out-hochuls-mask-mandate/
6  Kelly M. Cardin, "*New York Appellate Court Stays Mask Injunction*," Ogletree Deakins (Jan. 26, 2022), https://ogletree.com/insights-resources/blog-posts/new-york-appellate-court-stays-mask-mandate-injunction/

were not wearing masks at all, or were wearing masks below their noses. As on January 25, these classmates were rarely, if ever, targeted by Hafner for mask enforcement.

137.    When O.C.D. attempted to enter her homeroom class to begin the school day, a teacher, Barbara Addeo, physically blocked O.C.D. from entering the classroom and told O.C.D. that she would not be allowed in without a mask, and to go to Hafner's office. At this time, multiple other students were in the homeroom class not wearing masks.

138.    When O.C.D. entered Hafner's office, V.M.D. was already present, having been detained by Hafner. To start the meeting, Hafner, not wanting to hear what O.C.D. had to say, said "I don't want to hear it, I've already talked to your brother."

139.    Hafner then demanded that O.C.D. put a mask on and that she power her phone down and give it to him. If Hafner had been confident that his own behavior was appropriate, he would not have asked O.C.D. to turn in her phone, as he was obviously afraid of being recorded engaging in abusive behavior. O.C.D. refused to hand over her phone.

140.    Afraid of what Hafner might do or say next, O.C.D. used her cell phone to record an approximately six-minute sliver of their encounter (the "Recording"), in order to preserve the evidence of what she correctly perceived to be pedagogical abuse by her principal, deprivation of her right to an education, and singling her out from amongst her peers for unusually strict and exacting enforcement of a rule that was being generally disregarded by most of her peers at the time, all as part of Defendants' coordinated and systematic effort to bully, harass, intimidate, and scare Dinero and his children in retaliation for his successful lawsuit against the OPCSD Parties, critical speech directed toward the OPCSD Parties, and various other acts and speech, including the Podcast Statement.

141.    O.C.D. and V.M.D. asked Hafner—who is not an attorney—to provide the legal

basis for forcing them to wear a mask. Even after V.M.D. showed Hafner a copy of Justice Rademaker's ruling, Hafner claimed that he could still make them wear a mask, even though no Stay had yet been issued, stating, among other things: "From a conversation I had from [sic] Mr. Lilleck, is that we are in our purview to mandate or continue to mandate masks based on everything that's happened last night and we're going to continue to have that mandate, and if you're not going to abide by that…..[trails off]" O.C.D. indicated that they would abide by the mask mandate once it was "real," i.e., there was a Stay issued by the Appellate Division, Second Department. As O.C.D. and V.M.D. continued to explain to Hafner that there was no legal document requiring them to wear a mask at that moment, Hafner kept referring to OPCSD's attorneys and urging O.C.D. and V.M.D. to have their attorneys communicate with OPCSD attorneys, and further referred to Erie County's mask mandate (which in any event, would be subordinate to State Law). Meanwhile, O.C.D. and V.M.D. continued to demand that Hafner provide legal proof to back his demand for masking, which he was unable to provide, instead resorting to a *Buffalo News* article about Justice Rademaker's ruling, and conceding, "I'm not sure you're going to find a legal document…," to which O.C.D. responded "because it doesn't exist!" Nonetheless, when O.C.D. insisted that she be returned to class, Hafner indicated that neither she nor V.M.D. would be permitted to do so without a mask, stating "you guys are staying down here, in our office."

142.    The meeting with Hafner went on for approximately two hours, at which time, undeterred by Hafner's unlawful directive to don masks, O.C.D. and V.M.D. attempted to return to class, whereupon an administrator followed O.C.D. and V.M.D., calling them names in a loud voice and even grabbing V.M.D. to stop him from returning to class. While the administrator yelled at O.C.D. and V.M.D., a teacher became involved and told both of them, in a threatening tone, to return to Hafner's office. O.C.D declined and returned to her **classroom**, at which point the

administrator attempted to remove O.C.D from the classroom in front of her classmates, in a humiliating scene. Further escalating the intimidation, a TOPPD School Resource Officer told O.C.D., in front of her classmates, that she had to leave the classroom and return to the office. Although O.C.D. felt substantial humiliation, she complied, went back to Hafner's office, and waited for him to give her disciplinary paperwork. Hafner, backed by the Officer, then unceremoniously kicked O.C.D. and V.M.D. out of the building. After Hafner and the Officer escorted O.C.D. and V.M.D outside, Dinero picked them up.

143.     Meanwhile, over at Ellicott Elementary School, R.B.D. and R.E.D. entered their classroom at the beginning of the school day without a mask, which was entirely lawful under the Nassau County Supreme Court ruling. Upon entering the classroom, their teacher angrily sent them to Nigro's office. Once in Nigro's office, R.B.D. and R.E.D. showed her a letter from Dinero stating that they did not need to wear a mask, together with a copy of the Supreme Court ruling. In an elevated and intimidating tone of voice, Nigro told the young boys that none of this mattered, and she demanded that the youngsters wear masks or else face punishment. R.B.D. and R.E.D. became fearful and thought they would get in trouble with Nigro if they disagreed with her. Given the overwhelming difference in age and authority, R.B.D. and R.E.D. had no choice but to comply with Nigro's unlawful instruction, put on a mask, and return to class. After school, R.B.D. and R.E.D. reported to Dinero that Nigro had made them feel scared. Nigro, for her part, had communicated with Lilleck about this interaction and acted with his blessing.

144.     Several days passed, and the OPSCD Parties then became aware of the O.C.D.'s Recording. On January 28, in a grotesque display of retaliation on top of retaliation, the OPCSD Parties began to threaten additional disciplinary penalties against O.C.D. under OPCSD's Code of Conduct, not for any substantive offense, but for having made the Recording.

145.    The OPCSD Parties had good reason to be concerned about the Recording, as they knew it was further evidence of the OPCSD Parties' ongoing efforts to bully, harass, and target Dinero and his family.

146.    OPCSD's Code of Conduct was silent on the issue of recordings. As such, O.C.D. had no fair warning that she would suffer disciplinary actions for making the Recording. In any event, she had a constitutional right to make the Recording.

147.    As well, to the extent OPCSD's Code of Conduct prohibited O.C.D's Recording, she never agreed to the Code of Conduct, and OPCSD had no evidence that she ever agreed to this Code of Conduct. OPCSD never presented the Code of Conduct to O.C.D. to sign and acknowledge.

148.    Moreover, any provision of the OPCSD Code of Conduct that prohibits the audio recording of a school staff member when meeting one-on-one with a student does not comport with New York law and such a recording is likely the only way for a student in such circumstances to preserve evidence of such an encounter.

149.    As OPCSD continued to threaten O.C.D. with suspension, Dinero once again took action. On January 31, 2022, he filed four Verified Petitions with NYSED (the "NYSED Petitions") on behalf of each of his four affected children.

150.    The Petition for O.C.D. was captioned *In the Matter of Robert F. Dinero on behalf of [O.C.D.] from action of the Board of Education of the Orchard Park School District; Superintendent David Lilleck; And Principal Brandon Hafner regarding the denial of education on January 25, 2022*, in order to stop OPCSD from disciplining O.C.D. The relief sought by Dinero included (a) "[t]hat all disciplinary actions taken by respondents against [O.C.D.] for not wearing a mask to school on January 25, 2022 be found to be null, void, and improper and that all records

of such disciplinary actions be removed from [O.C.D.] file/student record; and (b) removal of Hafner and Lilleck from their positions.

151.    The Petition for V.M.D. was captioned *In the Matter of Robert F. Dinero on behalf of [V.M.D.] from action of the Board of Education of the Orchard Park School District; Superintendent David Lilleck; And Principal Brandon Hafner regarding the denial of education on January 25, 2022*, and seeking the same relief as the O.C.D. Petition.

152.    The Petition for R.B.D. was captioned *In the Matter of Robert F. Dinero on behalf of [R.B.D.] from action of the Board of Education of the Orchard Park School District; Superintendent David Lilleck; And Principal Diana Nigro regarding the denial of education on January 25, 2022*, in order to stop OPCSD from disciplining R.B.D and seeking other similar relief against Lilleck and Nigro as in the O.C.D. and V.M.D. Petitions.

153.    The Petition for R.E.D. was captioned *In the Matter of Robert F. Dinero on behalf of [R.E.D.] from action of the Board of Education of the Orchard Park School District; Superintendent David Lilleck; And Principal Diana Nigro regarding the denial of education on January 25, 2022*, and sought the same relief as the R.B.D. Petition.

154.    Ultimately, OPCSD, faced with the prospect of certain defeat before the Education Department on the issue of the January 25 Targeting, informed Dinero that OPCSD would no longer pursue discipline against O.C.D., V.M.D., R.B.D., or R.E.D., after which Dinero withdrew the NYSED Petitions.

155.    The OPCSD Parties' shameful retaliation against Dinero's children was not limited to the January 25 Targeting—far from it. Also on Lilleck's menu of retaliation was putting Dinero's children in danger along a busy road.

156.    Before the events of January 25, Lilleck had informed Dinero that he could pick

up R.B.D. and R.E.D from Ellicott Elementary School, but not at the normal pickup location at the school entrance, and in fact, not on OPCSD Property at all.

157.    Instead, Lilleck, unconcerned by the prospect of subjecting youngsters R.B.D. and R.E.D. to risk of death or serious injury, designated Ellicott Road, located east of the School and off OPCSD Property, as the drop-off and pickup point, which would necessitate Dinero stopping his vehicle in an active traffic lane for drop-off and pickup, and waiting for his sons to cross the parking lot and grass between the School and Ellicott Road without OPCSD faculty supervision (the "Ellicott Road Endangerment").

158.    Ellicott Road was and still is a busy road with a speed limit of 45 MPH, has substantial traffic during school drop-off and pickup hours, and no stopping or parking areas such as shoulders or turnouts.

159.    While it was already well-known that Lilleck hated Dinero's beliefs and what he stood for with a burning passion, Lilleck's lack of concern for the safety of Dinero's children, and Lilleck's willingness to expose Dinero's children to the risk of death or serious injury, was astonishing and spoke volumes about the lengths to which Lilleck was willing to go to strike at Dinero. Indeed, the possible death of or serious injury to a pair of innocent children in Lilleck's care along a busy road presented no concern whatsoever to him or anyone else at OPCSD.

160.    Each and every time Dinero was forced to pick up his children on the side of Ellicott Road, Dinero and his children were exposed to an unreasonably high risk of imminent harm as cars sped by.

161.    Exacerbating matters, the drop-off/pickup point along Ellicott Road, unlike the normal drop-off/pickup point for everyone else, was located a great distance from the School entrance, which meant that Dinero and his children were exposed to the harsh elements of the

Western New York winter on a daily basis. While all other children were able to get out of their bus or their parents' vehicles and walk right into the School with no exposure to cold, wind, snow, ice, sleet, or freezing rain, the same could not be said for Dinero's sons.

162.    Either Dinero or his sons could have been struck by a vehicle as a result of Lilleck's absurd and unprecedented policy forcing Dinero to pick up his children on the side of a busy road rather than, for example, anywhere in the large parking lot in front of the School. Every day, cars, trucks, and buses whizzed past them at dangerous speeds and often during dangerous weather conditions.

163.    The OPCSD Parties, especially Lilleck and the Ellicott Elementary School employees who went along with Lilleck's disgraceful Ellicott Road Endangerment, knew that forcing Dinero to pick up his children on the side of the Ellicott Road in front of the School would be dangerous to both Dinero and his children, but stayed the course and continued their reckless course of action, since turning the screws on Dinero remained the paramount goal of Lilleck's administration.

164.    Unsurprisingly, but shamefully, the Ellicott Road Endangerment continued well into April 2022, at which time Judge Pace modified the First False Order of Protection to allow for Dinero to enter the Ellicott Elementary School parking lot.

### d. The Final Months of the 2022 School Year: Lilleck Sinks to a New Low, Instigating the Fourth False Arrest After Dinero Asks for Permission to Attend a Family Ice Cream Event at Ellicott Elementary School

165.    Unfortunately, the passage of time did not quiet Lilleck's desire to wage a relentless campaign of retaliation against Dinero, and Lilleck would stop at nothing to have Dinero arrested repeatedly even without any lawful basis, as Dinero would soon learn when he tried to attend a "family fun night" at Ellicott Elementary School.

166.     On April 19, 2022, Dinero appeared before Judge Pace for a status conference in Criminal Prosecution #3. Judge Pace issued a Second False Order of Protection (Order #2022-000037) superseding the First Order, which required Dinero to stay away from Lilleck, Walker, Mielcarek, and Hylkema, but containing the exception "[t]hat Robert F. Dinero is allowed to drop off and pick up his son [V.M.D.] on the west side of Baker Road at the sidewalk leading to the front doors of the OP High School. Also that Robert F. Dinero is allowed to drop off and pick up his [sons R.B.D. and R.E.D] inside the Ellicott Road School parking lot at a safe location for his sons to walk into the Ellicott Road School."

167.     Two days later, on April 21, Lilleck sent a letter to Dinero amending the Prohibition "to match the current order of protection" (the Fourth Prohibition Letter). The Letter then went on to threaten criminal prosecution, including "immediately contact[ing] law enforcement" and "criminal trespass in violation of New York State Penal Law § 140.10" for being "on school property outside of the exceptions contained in the current temporary order of protection, without *express written permission from me . . . .*" As with the prior Prohibition Letters, Lilleck needlessly copied TOPPD, the Board, OPCSD Principals, and Beardsley.

168.     On April 27, Dinero, reasonably believing he was complying with Lilleck's instructions in the First, Second, Third and Fourth Prohibition Letters requiring Dinero to seek written permission to attend school events, emailed Lilleck a request as follows: "Dave, I am requesting permission to participate in the family fun night on 6 May. I've signed up for the ice-cream table duty from 1900-1930. Thanks, Robby Dinero" (the "Ice Cream Email").

169.     At the time, Dinero did not give a second thought to making his innocent request to participate in an ice-cream table at Ellicott Elementary School family fun night. However, Lilleck saw Dinero's Ice Cream Email as an opening to cause even more difficulties for Dinero.

170.     Once again, consistent with his pattern, Lilleck allowed a significant amount of time to pass before acting. Lilleck initially responded to Dinero's Ice Cream Email and denied permission to attend family fun night, but took no immediate action to have him arrested. Instead, Lilleck let a significant amount of time pass before acting.

171.     On June 13, well over a month after Dinero had sent the Ice Cream Email, TOPPD effectuated the fourth False Arrest at Lilleck's behest, with Mazur and Raisor serving Dinero with a Criminal Summons dated June 13 for one count under Penal Law § 215.50(3) (Criminal Contempt in the 2nd Degree—an "A" misdemeanor) in connection with Dinero emailing Lilleck to request permission to participate in a *family fun night* on May 6, 2022. (False Arrest #4).

172.     The Criminal Prosecution arising out of False Arrest #4 was assigned docket # 22-012869 and case # 22060185 by the Orchard Park Town Court (Criminal Prosecution #4). The Prosecution was ultimately transferred to Orchard Park Village Court and assigned case # 22060035.

173.     The Criminal Information/Complaint for False Arrest #4/Criminal Prosecution #4, filed in Town of Orchard Park Town Court, stated, in pertinent part: "I, **Police Officer KRISTEN A. MAZUR** . . . accuse **ROBERT F. DINERO** . . . that on or about Wednesday, April 27, 2022 . . . at about 11:48 AM . . . the said defendant did intentionally send an email to the listed victim [Lilleck] stating: 'Dave, I am requesting permission to participate in the family fun night on 6 May. I've signed up for the ice-cream table duty from 1900-1930. Thanks, Robby Dinero.' This email was a violation of the duly sworn Order of Protection (Order #2022-000037) issued by the Town of Orchard Park Court. This duly sworn Order of Protection directed the defendant to refrain from any communication or contact with the victim" (emphasis in original).

174.     Once again, Lilleck submitted a Supporting Deposition in furtherance of the Arrest,

despite the fact that he well knew that his Prohibition Letters all instructed Dinero to seek written permission from Lilleck in order to enter OPCSD Property. Of course, Dinero couldn't possibly seek written permission from Lilleck without actually contacting Lilleck.

175.    Even by Lilleck's standards, False Arrest #4, based entirely on an innocent request to attend family fun night, was a particularly shameful new low in Defendants' ongoing campaign against Dinero. No reasonable person could have felt threatened by Dinero's email and no reasonable person would have waited over a month to contact the police to report this non-issue.

### e. The 2022-2023 School Year Approaches: OPCSD Maintains the False Orders of Protection In Order to Exclude Dinero from Board Meetings, Even After Dinero Wins Dismissal of Criminal Prosecution #3

176.    As the 2022-2023 OPCSD school year approached, the OPCSD Parties sought and maintained two additional False Orders of Protection, dated August 4, 2022 (issued by the Hon. James C. Cosgrove in Orchard Park Village Court ("Judge Cosgrove")) and August 29, 2022 (also issued by Judge Cosgrove), both in Criminal Prosecution #2.

177.    Astoundingly, the OPCSD Parties insisted on maintaining these Orders even after an embarrassing retreat on August 4, when prosecutors agreed to drop the Trespass violation against Dinero, resulting in the dismissal of Criminal Prosecution #3 by Judge Cosgrove (the "First Dismissal").

178.    Although a reasonable person in Lilleck's position would have paused and reconsidered the relentless campaign of retaliation after the First Dismissal, Lilleck apparently lacked any introspection. Accordingly, on September 8, Lilleck, undeterred by the First Dismissal, issued another Prohibition Letter (the "Fifth Prohibition Letter"), amending the Prohibition to "permit you to be on District grounds and in District buildings with the same access as other parents and community members with the exception of Board of Education meetings." As with

the prior Prohibition Letters, Lilleck gratuitously copied TOPPD, the Board, OPCSD Principals, and Beardsley.

179.    While the Fifth Prohibition Letter rolled back the Prohibition to a limited extent, Lilleck continued to maintain his unconstitutional exclusion of Dinero from Board Meetings, thereby continuing to accomplish OPCSD's objective of silencing Dinero. Indeed, the Fifth Prohibition Letter made clear that Lilleck was not concerned about violence because he permitted Dinero on school property *other than* Board Meetings. That is, the letter made it clear that Lilleck was only concerned with Dinero's speech at Board Meetings.

### f.    Dinero Prevails in the Remaining Criminal Prosecutions, Demonstrating That There Was No Probable Cause for the False Arrests in the First Place

180.    As the 2022-2023 school year approached, Dinero continued to maintain his faith in the truth: that he had done nothing wrong and had been the target of unconstitutional retaliation by Defendants. Thus, he patiently awaited his day in court on all of the charges against him. Dinero's goal, understandably, was to vindicate his reputation in the face of wrongful prosecutions. Although Dinero's faith had already been rewarded with the First Dismissal on August 4, he still had to contend with Criminal Prosecutions #1, #2, and #4.

181.    Meanwhile, Lilleck, driven by an insatiable hunger to inflict ever more harm on Dinero and his family, eagerly awaited the opportunity to testify against Dinero at trial in the remaining Criminal Prosecutions. Lilleck's goal was far less understandable: even with the passage of time, he vindictively insisted on pressing all charges against Dinero until the bitter end.

182.    On the evening of February 2, 2023, Justice Cosgrove conducted two bench trials in Orchard Park Village Court, again before Judge Cosgrove (the "First Trial" and the "Second Trial"). The First Trial covered False Arrest #2/Criminal Prosecution #2 (date of allegations: December 9, 2021). The Second Trial covered False Arrest#1/Criminal Prosecution #1 (date of

allegations: December 14, 2021) (the First and Second Trials together the "Criminal Trials").

183.    Assistant District Attorney Jia-Jair Chiu ("Chiu") prosecuted both Criminal Trials, while Justin Ginter ("Ginter") of the firm Lipsitz Green Scime Cambria LLP represented Dinero.

184.    Lilleck and Walker testified against Dinero in the First Trial, while Dinero presented no witnesses. Immediately after the conclusion of the First Trial, Judge Cosgrove began the Second Trial, at which Lilleck and Purucker testified against Dinero, followed by Aldinger in Dinero's defense. Dinero did not testify.

185.    Judge Cosgrove then retired to combined deliberations on the Criminal Trials, and quickly returned to announce the following verdicts: in Criminal Prosecution #2 (First Trial), "not guilty" on the Penal Law § 140.10(b) charge, and in Criminal Prosecution #1 (Second Trial), "not guilty" on the Penal Law § 140.10(b) charge with a verdict of "guilty" on the lesser included offense of Penal Law § 140.05 (a violation, not a crime).

186.    The Criminal Trials having been completed, Dinero's ordeal of wrongful criminal charges had been whittled down to only one: the charge of Criminal Contempt in the 2nd Degree in Criminal Prosecution #4.

187.    Thereafter, Ginter filed a motion to dismiss Criminal Prosecution #4 on behalf of Dinero. On June 1, 2023, Judge Cosgrove considered Ginter's motion. Following oral argument by Chiu and Ginter, Judge Cosgrove granted the motion and dismissed Criminal Prosecution #4 (the "Second Dismissal," together with the First Dismissal, the "Criminal Dismissals").

188.    The Second Dismissal capped off an embarrassing series of legal defeats for the Defendants against Dinero: the Dinero Article 78 Proceeding, the NYSED Petitions, the Criminal Trials, and the Criminal Dismissals.

189.    As confirmed by the outcome of the Criminal Trials, Defendants, in pursuing their

relentless campaign of retaliation against Dinero for his protected speech and petition for redress of grievances, had wasted substantial taxpayer dollars and betrayed their mission to serve the Orchard Park community with honesty and integrity.

190.   Moreover, as also confirmed by the outcome of the Criminal Trials, the False Arrests had occurred without probable cause and were instigated by Lilleck solely to injure Dinero.

191.   Indeed, with Dinero's victories in the Criminal Prosecutions, his vindication should have been complete. However, as set forth below, this was not possible—Defendants' ceaseless retaliation had caused Dinero severe reputational harm and loss of esteem in the Orchard Park community.

### g.   Financial and Reputational Harm to Dinero, and the Ongoing Danger to Dinero's Children

192.   The harm inflicted by Defendants upon Dinero was not limited to the harm directly associated with the Prohibition Letters (and the Prohibition itself), the False Arrests, and Criminal Prosecutions.

193.   As a direct result of the retaliatory actions taken by Defendants, Dinero's reputation in the Orchard Park community was seriously and irreparably harmed.

194.   Most notably, Dinero's fitness business, Athletes Unleashed, lost a substantial portion of its customer base as a direct result of the Prohibition, the False Arrests, and the Criminal Prosecutions, all effectuated, instigated, or orchestrated by Defendants. As a result of these occurrences that would never have occurred but for Defendants' retaliation against Dinero, many clients of Athletes Unleashed chose to cancel their memberships, wrongly perceiving that Dinero was disreputable, dangerous, or a criminal, or all of the above.

195.   This exodus of clients resulted in a substantial loss of revenue beginning coinciding with Defendants' retaliatory actions.

196.     Indeed, although Athletes Unleashed, like almost all other businesses, was negatively impacted by the Pandemic, Athletes Unleashed had recovered by 2021 and was on its way back to pre-Pandemic levels of success. However, after Defendants' retaliatory actions, this recovery stopped and reversed.

197.     Ultimately, for a business driven by Dinero's personal brand, a relentless campaign of retaliation spearheaded by Lilleck and backed by the full force of local government proved too much to withstand, forcing Dinero to close Athletes Unleashed.

198.     On top of this enormous loss of business, Dinero was also compelled to incur very significant legal fees, expend huge amounts of time, and endure crushing stress, all to defend against the Criminal Prosecutions, fees that he never would have incurred, time he never would have expended, and stress he never would have endured, but for Defendants' retaliation.

199.     In addition, wrongly branded as a criminal by Defendants, when in reality he is an American hero who risked his life for the United States in combat, Dinero has suffered enormous loss of esteem and reputation in the Orchard Park community that reverberates far beyond Athletes Unleashed.

## CLAIMS FOR RELIEF

### COUNT ONE
**Violation of the United States Constitution**
**First and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**Retaliation**
**(Plaintiff v. All Defendants)**

200.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

201.     The First Amendment to the Constitution, incorporated through the Fourteenth Amendment, provides in pertinent part:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances.

> U.S. CONST. amend. I.

202.    Dinero's First Amendment retaliation claim is brought pursuant to 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

203.    To state a prima facie case of First Amendment retaliation under § 1983, a plaintiff is required to demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant[s] took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 476 (E.D.N.Y. Oct. 4, 2019) (emphasis added) (quoting *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003)); *see also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001).

204.    As to (1), the "protected speech" element of the prima facie case, as a general rule, speech on "any matter of political, social, or other concern to the community" is protected by the First Amendment. *Connick v. Myers*, 461 U.S. 138, 146 (1983). Notably, "the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 896-897 (1984). "The First Amendment protects the right to initiate traditional litigation . . . but also Article 78 proceedings." *Best Payphones*, 410 F. Supp. 3d at 477 (citing *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994)).

205.    As to (2), the "adverse action" element of the prima facie case, "[i]n the context of

a First Amendment claim . . . '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.' " *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (quoting *Dawes*, 239 F.3d at 493).

206.    As to (3), the "causal connection" element of the prima facie case, a plaintiff must show that his or her speech was "a substantial motivating factor" in the retaliatory conduct. *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004) (quoting *Morris v. Lindau*,196 F.3d 102, 110 (2d Cir. 1999)).

207.    Here, Dinero engaged in numerous instances of protected speech and petition for redress of grievances, including but not limited to: (a) the Dinero Article 78 Proceeding to force the Reopening; (b) Dinero's Criticism; (c) the Podcast Statement; (d) the NYSED Petitions; (e) communications to Lilleck seeking permission to enter OPCSD Property, including but not limited to the Ice Cream Email; (f) dropping off and picking up his children from their schools; and (g) successfully defending himself in the Criminal Trials against the False Arrests and False Orders of Protection, ultimately winning acquittals.

208.    The OPCSD Parties took numerous adverse actions against Dinero for this protected speech and petition for redress of grievances, including but not limited to: (a) instigating the False Arrests; (b) instigating and maintaining the False Orders of Protection; (c) instigating and maintaining the Criminal Prosecutions; (d) the January 25 Targeting; (e) the Ellicott Road Endangerment; (f) testifying against Dinero at the Criminal Trials; (g) sending the Prohibition Letters to Dinero; and (h) imposing the Prohibition against Dinero in order to stop him from entering OPCSD Property and attending Board Meetings.

209.    In addition, Lilleck lacked the authority to prohibit Dinero from attending Board

Meetings; the OPCSD Code of Conduct could not be used to override Dinero's legal right to attend public hearings under the New York Open Meetings Law. *See, e.g., Goetschius v. Bd. of Educ. of Greenburgh Eleven Union Free Sch. Dist.*, 244 A.D.2d 552, 553 (2d Dep't 1997) (finding that a school board's exclusion of individuals from attending board meetings would run afoul of Public Officers Law § 110 (Part of the Open Meetings Law) which provides that "[a]ny provision of a . . . rule or regulation affecting a public body which is more restrictive with respect to public access than this article shall be deemed superseded hereby to the extent that such provision is more restrictive than this article."). Accordingly, the Prohibition Letters and the Prohibition itself— which improperly barred Dinero from OPCSD Property based on Lilleck's speculation about what Dinero *might do* in the future—had no basis in statute, further evidencing the retaliatory nature of the Prohibition.

210.    The TOPPD Parties conspired with the OPCSD Parties to retaliate against Dinero, and took numerous adverse actions against Dinero in support of the OPCSD Parties' campaign of retaliation for this protected speech and petition for redress of grievances, including but not limited to: (a) effectuating the False Arrests; (b) effectuating the Criminal Prosecutions; (c) aiding in the January 25 Targeting; and (d) aiding in the Prohibition.

211.    Defendants' numerous separate adverse retaliatory actions, both in their totality and individually, would have deterred a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

212.    There was a clear causal connection between Dinero's protected speech and petition for redress of grievances and the retaliatory conduct of Defendants. His protected speech and petition for redress of grievances was clearly the substantial motivating factor—indeed, the only motivating factor—behind the retaliation. Had Dinero never engaged in his protected speech,

Defendants would never have targeted Dinero and his family for retaliation.

213.    At all times, Defendants were acting under color of state law when they targeted Dinero and his family for retaliation.

214.    Defendants' aforesaid retaliatory conduct violated Dinero's clearly established constitutional rights to free speech and petition for redress of grievances.

215.    As a direct result of the aforesaid retaliatory conduct, Dinero suffered confinement and was subjected to the criminal process all the way through to the Criminal Trials and the Criminal Dismissals, all without his consent and without justification; and Dinero in a multitude of other ways, including but not limited to harming his reputation and standing in the community, humiliating him, costing Dinero his business, forcing him to incur substantial legal fees, causing him to lose his Second Amendment rights, and endangering the welfare of his children.

216.    Accordingly, Dinero is entitled to compensatory and punitive damages to be determined upon trial of this action; a permanent injunction enjoining Defendants from retaliating further against Dinero and his family for his exercise of rights under the First and Fourteenth Amendments; and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**<u>COUNT TWO</u>**
**Violation of the United States Constitution**
**Fourth and Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**<u>False Arrest</u>**
**(Plaintiff v. All Defendants)**

217.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

218.    The Fourth Amendment to the Constitution, incorporated through the Fourteenth Amendment, provides in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated . . . ."

U.S. CONST. amend. IV.

219.    Dinero's Fourth Amendment claim is brought pursuant to 42 U.S.C. § 1983.

220.    Under New York law, a prima facie case of false arrest requires a showing that the defendant intentionally confined the plaintiff without his consent and without justification. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996) (citing *Broughton v. State*, 37 N.Y.2d 451, 456, *cert. denied*, 423 U.S. 929 (1975)). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant*, 101 F.3d at 852; *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995), *cert. denied*, 517 U.S. 1189 (1996); *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992); *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991).

221.    Here, all four False Arrests were false arrests in violation of the Fourth Amendment because all four Arrests were made without probable cause, improperly instigated by the OPCSD Parties led by Lilleck, and effectuated by their friends in TOPPD, including Fitzgerald and Wehrfritz, and the various Lieutenants and officers under their command, including Purucker, Bowersox, Gehring, Mazur, Raisor, and Rizzo.

222.    Through the combination of the Criminal Dismissals and acquittal at the Criminal Trials, the Criminal Prosecutions were terminated in Dinero's favor (other than the sole "guilty" verdict on one count of the lesser-included offense of *non-criminal* Trespass), further cementing the fact that the False Arrests were made without probable cause.

223.    As a direct result of the False Arrests, Dinero suffered confinement and was subjected to the criminal process all the way through trial, all without his consent and without

justification. The False Arrests also damaged Dinero in a multitude of other ways, including harming his reputation and standing in the community, humiliating him, costing Dinero his business, forcing him to incur substantial legal fees, causing him to lose his Second Amendment rights, and endangering the welfare of his children.

224.    At all times, Defendants were acting under color of state law when they subjected Dinero to the False Arrests.

225.    Defendants' aforesaid False Arrests violated Dinero's clearly established constitutional right to be free from unreasonable seizures.

226.    Accordingly, Dinero is entitled to compensatory and punitive damages to be determined upon trial of this action; a permanent injunction enjoining Defendants from subjecting Dinero to unreasonable seizures, particularly arrest without probable cause; and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## JURY DEMAND

227.    Plaintiff hereby demands trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Dinero, demands judgment against the Defendants as follows:

a.    On Counts One and Two, compensatory damages in an amount to be determined upon trial of this action;

b.    On Counts One and Two, punitive damages in an amount to be determined upon trial of this action;

c.    On Count One, a declaration that Defendants violated Plaintiff's rights to free speech and petition for redress of grievances, guaranteed under the First and Fourteenth Amendments;

d.      On Count Two, a declaration that Defendants violated Plaintiff's right to be free from unreasonable seizures, particularly arrest without probable cause, guaranteed under the Fourth and Fourteenth Amendments;

e.      On Count One, a permanent injunction enjoining Defendants from retaliating against Plaintiff and his family for his exercise of rights under the First and Fourteenth Amendments; and

f.      On Count Two, a permanent injunction enjoining Defendants from subjecting Plaintiff to unreasonable seizures, particularly arrest without probable cause, in violation of the First and Fourteenth Amendments; and

g.      On Counts One and Two, attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Dated: March 12, 2024
       New York, NY                          Respectfully submitted,

                                             **BOCHNER PLLC**

                                             By: _/s/ Edward Andrew Paltzik_
                                             Edward Andrew Paltzik, Esq.
                                             Serge Krimnus, Esq.
                                             1040 Avenue of the Americas, 15th Floor
                                             New York, NY 10018
                                             (516) 526-0341
                                             edward@bochner.law
                                             serge@bochner.law
                                             _Attorneys for Plaintiff_